No. 24-11091

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE ELEVENTH CIRCUIT

---

Samantha Markle,

*Plaintiff-Appellant*,

v.

Meghan Markle,

*Defendant-Appellee*.

Appeal from the United States District Court
for the Middle District of Florida

No. 8:22-cv-00511-CEH-TGW

---

## APPELLANT'S OPENING BRIEF

---

Peter Ticktin, Esquire
**THE TICKTIN LAW GROUP**
270 SW Natura Avenue
Deerfield Beach, Florida 33441
Telephone: (954) 570-6757

*Attorney for Appellant*
Samantha Markle

**No. 24-11091**
**Samantha Markle v. Meghan Markle**

**Certificate of Interested Persons and**
**Corporate Disclosure Statement**

Appellant submits this Certificate of Interested Persons and Corporate

Disclosure Statement listing the parties and entities interested in this appeal, as

required by 11th Cir. R. 26.1.

Markle, Samantha

Kinsella Weitzman Iser Kump Holley, LLP

Kump, Michael J.

Steinsapir, Johnathan Phillip

Soltman, Nicholas

Bitman, Ron J.

Markle, Meghan

Liebler, Gonzalez & Portuondo

The Ticktin Law Group

Ticktin, Peter David

Sasson, Jamie Alan

Fojo, Ryan Scott

No publicly traded corporation or company has an interest in the

outcome of this case or appeal.

## STATEMENT REGARDING ORAL ARGUMENT

Oral Argument is desired as the issues can be a bit confusing and may require some clarification.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons and Corporate Disclosure Statement ................C-1

Statement Regarding Oral Argument .........................................................................i

Table Of Contents ................................................................................................. ii

Table of Citations ................................................................................................ iii

Jurisdictional Statement ........................................................................................iv

Statement of the Issue(s) .......................................................................................1

Statement of the Case.............................................................................................2

    A.    Nature of the Case ................................................................................2

    B.    Statement of the Facts ..............................................................................3

    C.    Statement of the Standard or Scope of Review...........................................8

Summary of the Argument ......................................................................................9

Argument..............................................................................................................11

    I.    Whether the district court erred in finding that the Appellant failed to state a cause of action for Defamation by Implication.................................................11

Conclusion ...........................................................................................................29

Certificate Of Compliance ...................................................................................30

Certificate Of Service...........................................................................................31

# TABLE OF CITATIONS

**Cases**

*AIDS Counseling & Testing Centers v. Group W. Television, Inc.,* 903 F. 2d 1000 (4th Cir. 1990)..............................................................................23

*Corsi v. Newsmax Media, Inc.,* 519 F. Supp. 3d 1110, 1123 - 1124 (S.D. Fla. 2021) ..............................................................................................................27

*Folta v. New York Times Co.,* No. 1:17cv246-MW/GRJ, 2019 U.S. Dist. LEXIS 34533 (N.D. Fla. Feb. 27, 2019)....................................................13

*Jacoby v. CNN, Inc.,* No. 21-12030, 2021 U.S. App. LEXIS 36594 (11th Cir. Dec. 10, 2021) .........................................................................................8, 12

*Markle v. Markle*, No. 8:22-cv-511-CEH-TGW, 2024 U.S. Dist. LEXIS 42887 (M.D. Fla. Mar. 12, 2024)...............................................................11, 19, 28

*Parekh v. CBS Corp.,* 820 F. App'x 827, 833 (11th Cir. 2020) ...............................13

*Thomas v. Jacksonville TV,* 699 So. 2d 800, 805 (Fla. 1st DCA 1997) ...................22

**Statutes**

28 U.S.C. § 1291 ............................................................................................... iv

28 U.S.C. § 1332(a)(1)......................................................................................... iv

# JURISDICTIONAL STATEMENT

Under 28 U.S.C. § 1332(a)(1), "The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between citizens of different States." The U.S. District Court for the Middle District of Florida had subject-matter jurisdiction because the parties in this civil action have complete diversity of citizenship, and the amount in controversy is in excess of $75,000.00, excluding interest, costs, and attorneys' fees.

The Court of Appeals has jurisdiction over all final decisions of the U.S. district courts under 28 U.S.C. § 1291. The U.S. Court of Appeals for the Eleventh Judicial Circuit has jurisdiction over federal cases originating in Florida. The U.S. District Court for the Middle District of Florida entered a Final Judgment and Order Closing Case in the instant matter, granting the Appellee's Motion to Dismiss on March 12, 2024. The Appellant timely filed its Notice of Appeal on April 8, 2024, and a Corrected Notice of Appeal was filed on April 9, 2024.

## STATEMENT OF THE ISSUE(S)

A.    Whether the district court erred in finding that the Appellant failed to

plead sufficient facts to state a cause of action for Defamation by

Implication.

## STATEMENT OF THE CASE

The Appellant, SAMANTHA MARKLE (hereinafter referred to as "Samantha") was the Plaintiff below, and the Appellee, MEGHAN MARKLE (hereinafter referred to as "Meghan"), was the Defendant below.

### A.     Nature of the Case

On March 12, 2024, the District Court issued its Order Dismissing Samantha's Two-Count, Third Amended Complaint[1] (hereinafter the "Operative Complaint") against Meghan for Defamation, and Defamation by Implication, finding that Samantha: "failed to identify any statements that could support a claim for defamation or defamation by implication. . ." (DE 113, p. 57).

The Operative Complaint was filed on April 13, 2023, and raised two counts: Count I – Defamation, and Count II – Defamation by Implication.  (DE 72).

The statements which formed the basis for the claims were defamation and defamation by implication which arose out of (1) an hour-long interview between Oprah Winfrey and Meghan and her husband, Prince Harry, and (2) a 6-part Series on Netflix, which Meghan and her production company edited and produced.  (DE 72).

------

[1]     This was a misnomer; the pleading was actually a 2nd amended compliant.

The hour-long interview with Oprah Winfrey (hereinafter referred to as the "Interview") aired on CBS on March 7, 2021, with an initial viewership of approximately 50 million viewers worldwide. (DE 72, ¶ 23).

On December 8, 2022, the streaming platform Netflix aired the first part of a 6-part mini-series, produced and edited by Meghan's production company, Archewell Productions, entitled *Harry & Meghan* (hereinafter referred to as the "Series"). (DE 72, ¶ 39). (In both the Interview and the Series, Meghan made a total of 16 defamatory comments causing Samantha to suffer injury to her reputation (both personal and professional), face relentless torment and harassment online, and the very real threats of violence and death, forcing her to find a new residence and move on more than one occasion. (DE 72).

**B. Statement of the Facts**

Samantha is the half-sister of Meghan on their father's side, and 17 years older than Meghan. (DE 72, ¶ 6 and DE 113, p. 2). Meghan is an American/Canadian actress, who "met and ultimately married Prince Harry, grandson of the late Queen Elizabeth of the British Empire and second son of King Charles III. (DE 72, ¶ 5).

Samantha is a wheelchair bound victim of Muscular Sclerosis, a debilitating disease which is worsened by stress, which is known to Meghan. (DE 72, ¶ 20).

Samantha lives in a small central-Florida city, where she is well known. (DE 72, ¶ 57). Despite their age difference, Samantha and Meghan were close during

Meghan's childhood, "and Plaintiff regularly drove Defendant to school and helped her with her homework." (DE 113, p. 2 citing to DE 72, ¶ 7). "They had a good to wonderful relationship." *Id. p. 3.* "Unfortunately, once Meghan met and began dating Prince Harry, Meghan became hostile to her half-brother and her father, and her relationship with Samantha became estranged." (DE 72, ¶ 9).

On Samantha's behalf, her first attorney filed an initial complaint on March 3, 2022, (DE 1), followed by an Amended Complaint (DE 31), by the undersigned attorneys, and following the court granting a motion to dismiss the Amended Complaint, on April 13, 2023 (DE 70), the Operative Complaint (DE 72) was filed.

The pertinent statements from the Operative Complaint are reproduced below, and where individually, each may be seemingly unactionable, together, when put together, they are damning. The trial court took Judicial Notice of the transcripts and footage of the Interview and the Series, as well as various articles. (DE 106; DE 118, p. 4, lines 5 – 25). This is explained below with the listing of the individual statements.

i. Netflix Series

The defamatory statements made in the Series, Episodes 2 – 5, "are either defamatory... when taken together to create the implication that SAMANTHA is a liar and "agent provocateur," the one who is fabricating stories, and a racist. (DE

72, ¶ 15).  The Operative Complaint cited statements from the Netflix Series, from Season 1, Episode 2; 27:46, Episode 3; 18:17, and Episode 5; 27:04 – 32:05.

The statements from Episodes 2 and 3 found in the Operative Complaint, which are pertinent to this appeal (DE 72, ¶ 49) are:

> a.    MEGHAN said: "I was with my mom during the week and with my dad on the weekends.  And my dad lived alone, he had two adult children who had moved out of his house."  [Series. Season 1, Episode 2; 27:46].
>
> b.    MEGHAN said: "You're telling people you raised me." [Series. Season 1, Episode 3; 18:17].
>
> c.    MEGHAN said: "I don't remember seeing her when I was a kid at my dad's house, if and when they would come around." [Series, Season 1, Episode 3; 18:31].

The trial judge incorrectly analyzed these statements as self-contained and came to an inescapable conclusion.  It raises a question of how Meghan saying that she did not recall seeing her older sister when she was a kid be damaging to the reputation of Samantha.  (DE 72, ¶ 49; sup-parts a, b, and c).

As was explained in argument at the hearing on the motion to dismiss the Operative Complaint, Samantha had written a book which was not demeaning to Meghan but which called her a "Pushy Princess" in the title.  (DE 118, p.11, lines 7-9; p. 37, lines 15-18).   Meghan, fearing the worst, did not want Samantha's book to succeed, so she created a false narrative, and made it known that she did not even know Samantha. (DE 118, p. 38, lines 11-16).

The entire point was to show the world that Samantha was a lying opportunist who wrote a book about her, when she did not even know Samantha, meaning that Samantha did not know her, either, and had no ability to write a book about her. Meghan appeared to be revealing a scam. (*Id. at* p. 38, lines 17-21).

Hence, words which seemed innocent, enough, were highly detrimental. Not only did Samantha's book fail, but worse, Samantha became subject to disdain, ridicule, hatred, smears on the internet and threats on her life, due to the statements made by Meghan. (DE 72, ¶¶ 29, 38).

The next set of statements are taken from Season 1, Episode 5 of the Series and were:

### 1. Statements by Christopher Bouzy of Bot Sentinel:

i. So this is not your everyday trolling. . . It's insane. And it was done by people who were just not the typical quote-unquote trolls. These are housewives. These are middle-aged Caucasian women creating just constant attacks, from "Go back to America," to basically, you know "Why don't you die?

ii. Samantha Markle was part of the group that was putting out a lot of disinformation.

iii. How can the half-sister of Meghan be a part of a hate group?

iv. Perhaps the most troubling part of this is the number of British journalists interacting with and amplifying the hate and the lies.

v. For the main hate accounts, their primary motive is monetizing this stuff.

vi. But the secondary accounts, its all about hatred.

vii. It's about, you know... You know, race.

viii. So then there would be derogatory terms where they would use the N-word on tweets.

ix. Samantha had her account suspended;" "And then we actually sent Twitter a list because she had, like, eleven additional accounts. And yeah, we were baffled by this.

**2. Harry, Prince of Wales commented:**

i. I think for people to understand, you know when you plant a seed that is so hateful, what it can grow into.

**3. Meghan had the final word of the Segment:**

i. Your making people want to kill me – it's not just a tabloid. You are making me scared.

Paragraphs 50 – 55 of the Operative Complaint analyzed the statements and explained "how" each of the statements are either: true, false, or partially true. Meghan, through her production company Archewell Productions, produced, edited, and therefore, published the statements above. (DE 72, ¶ 46). In agreeing with Samantha on this point, the trial court stated: "Taking her allegations as true and

drawing all reasonable inferences in her favor, Plaintiff sufficiently pleads that Defendant "published" the statements." (DE 113, p. 40).

After briefing and oral argument, the District Court dismissed Samantha's Third Amended Complaint on March 12, 2024, *with prejudice* as to counts I and II. This appeal follows.

## C.    Statement of the Standard or Scope of Review

The standard of review is de novo.

> We review de novo the district court's grant of a motion to dismiss for failure to state a claim, accepting the allegations in the complaint as true and construing them in the light most favorable to the plaintiff.

*Jacoby v. CNN, Inc.,* No. 21-12030, 2021 U.S. App. LEXIS 36594 (11th Cir. Dec. 10, 2021).

# SUMMARY OF THE ARGUMENT

The District Court erred by analyzing the defamatory statements from the Series and the Interview individually. It is the impact of the statements, read in order, and in context, that creates the defamatory implication. The juxtaposition of truthful statements, and the implied defamation created by omitting facts from statements, implying that the Samantha is a lying, racist, fame-seeker who is out to harm Meghan and capitalize on that harm caused.

Meghan is responsible for the statements. Meghan either said the defamatory statements, or she published the statements said by others. Meghan intentionally chose the order and structure of the statements, as well as the orator of the statements. It cannot be disputed that Meghan, at all times, knew the truth, could have easily discovered the truth, or in spite of knowing the falsity, said or published the statements at action. Meghan set out to, and did, harm her half-sister, Samantha.

The District Court erred in trying to find each individual statement actionable. The analysis for defamation by implication is the meaning and impact of the collective statements, and their careful arrangement which in fact create defamation through implication. A reasonable person watching the Interview and Series would have readily attributed these statements to Samantha, as many people have and as a result, Samantha faces daily harassment and threats, both online and in real life. Once respected in her small Florida community, Samantha now fears for her safety

daily, already having had to move more than once due to the very real threats of violence.

Meghan knew what she was doing, and how to do it. She destroyed Samantha publicly and on a global scale. She has made it so Samantha cannot work, or even enjoy the most mundane of activities, like going to the grocery store without constant harassment. All of which stems from the defamatory implications about Samantha which Meghan placed in the world for the sole purpose of destroying her disabled half-sister.

## ARGUMENT

### I. The District Court erred in dismissing the Third Amended Complaint for failure to state a cause of action for Count II – Defamation by Implication.

Contrary to the assertions of Meghan and the District Court, Samantha pled enough facts to establish a cause of action for Count II - Defamation by Implication. In its Order Dismissing the Matter, the District Court asserted that the "Plaintiff fails to adequately state a claim for defamation by implication for a simple reason. *She fails to identify the literally true facts that would serve as the basis for a claim*." *Markle v. Markle*, No. 8:22-cv-511-CEH-TGW, 2024 U.S. Dist. LEXIS 42887 (M.D. Fla. Mar. 12, 2024) (Emphasis added.)

In so holding, the District Court found that the Third Amended Complaint failed to: (1) demonstrate which statements were true and how their juxtaposition created the defamatory implication, (2) demonstrate what omissions of facts caused the statements to be defamatory, and (3) that the statements in the Series could not be found to be "of and concerning" Samantha. Additionally, the District Court found that Samantha failed to plead actual malice as Samantha did not "allege facts that would allow the Court to reasonably infer that Defendant actually entertained serious doubts as to the veracity of the published account or was highly aware that the account was probably false." *Id. at* 35.

As this Court recently held:

> To withstand a motion to dismiss under Federal Rule of
> Civil Procedure 12(b)(6), a complaint must include
> enough facts to state a claim to relief that is plausible on
> its face. While legal conclusions can provide the
> framework of a complaint, they must be supported by
> factual allegations. *Jacoby v. CNN, Inc.,* No. 21-12030,
> 2021 U.S. App. LEXIS 36594 (11th Cir. Dec. 10, 2021).
> (Internal citations and quotations omitted).

Samantha concedes that the Statements from the Interview, and the
Statements from the Series, Season 1, Episodes 2 and 3, are non-actionable, and as
they are false statements or opinions and therefore do not support a cause of action
for Defamation by Implication. However, the Statements from Season 1, Episode 5
of the Series are actionable, and when analyzed correctly, a cause of action for
Defamation by Implication is readily apparent.

The Operative Complaint pled sufficient facts to plausibly state a cause of
action for defamation by implication. The Operative Complaint gave Meghan
sufficient notice as to which statements were true and which statements were false.
Samantha explained in the Operative Complaint how the juxtaposition of true
statements created defamatory implications, as well as which omissions created
defamation by implication. Finally, Samantha properly pled sufficient facts and not
just legal conclusions to establish actual malice.

## A. Defamation by Implication

In reviewing the statements from the Series individually, the trial judge applied the wrong analysis and failed to see the reasonable connection between the juxtaposition of the true statements and their defamatory implication. Furthermore, this isolated analysis means the trial judge did not properly review the weight of the omitted facts pled by Samantha, which in their absence created the defamatory implication. In other words, the District Court judge failed to grasp the impact the series of statements (as a whole) had on Samantha's reputation and the unwarranted implication of the awful and terrible traits ascribed to Samantha by Meghan.

"To determine if a statement is defamatory, it must be considered in the context of the publication." *Parekh v. CBS Corp.,* 820 F. App'x 827, 833 (11th Cir. 2020). And in *Folta v. New York Times Co.,* No. 1:17cv246-MW/GRJ, 2019 U.S. Dist. LEXIS 34533 (N.D. Fla. Feb. 27, 2019), the Northern District of Florida held:

> In determining the availability of a defamatory meaning for a given statement, a court considers the statement in the context of the publication as a whole and evaluates it as it would be understood by the common mind. <u>A court must consider a publication in its totality, looking at all the words used, not merely a particular phrase or sentence. Articles are to be considered with their illustrations; pictures are to be viewed with their captions; stories are to be read with their headlines.</u> In addition, publications should be evaluated not by extremes, but as the common mind would naturally understand it. The *Byrd* court clarified further, indicating that statements should be considered in [their] natural sense without a forced or strained construction. *Id. at 28.* Citing *Byrd v. Hustler*

*Magazine, Inc.,* 433 So. 2d 593 (Fla. 4th DCA 1983) (Emphasis added.) (Internal citations and omissions omitted.)

Thus, in reviewing the statements giving rise for a claim for Defamation by Implication, the statements must be (1) taken as a whole, and (2) viewed through the eyes of a reasonable person and applying the plain meaning of the words.

   i. **When viewed as a whole, Meghan used the statements in the Series to defame Samantha by implying that she is a racist troll who has numerous accounts on Twitter solely for the purpose of harming Meghan.**

The Statements from the Series, Season 1, Episode 5 (hereinafter referred to as the "Segment") through omission of facts and juxtaposition of the truth created the very real implication that Samantha is a racist troll and member of the group of individuals who are harassing and attacking Meghan online and spreading disinformation.

Although membership in a group does not necessarily ascribe negative acts or attributes to all members of the group, in this case, it does. This is so because the group is defined by the acts, themselves. So, by definition of membership, a group of people defined as those who spread disinformation against Meghan, defines everyone in the group, as engaging in that activity. They either have the attributes or they are not a member of the group.

The Segment features Meghan, Prince Harry, and Christopher Bouzy discussing the dissemination of disinformation about Meghan. For the benefit of the

Court, the Segment is reproduced *infra*, in chronological order. The Segment begins

around the 27-minute mark, concluding 5-minutes later, at or around the 32-minute

mark, and are reproduced in Paragraph 49 and its subparts of the Operative

Complaint.

The Segment:

a.   **Podcaster:** Just a month ago, a report by Bot Sentinel, a company which analyzes Tweets, uh, found that a very small number of anti-Meghan and Harry accounts were responsible for a huge percentage of the hateful content about you on Twitter."

b.   **Prince Harry:**
  i.   Misinformation is a global humanitarian crisis.

  ii.  We know that a small group of accounts are allowed to create a huge amount of chaos online, and without any consequences whatsoever.

c.   **Podcaster:**

  i.   Bot Sentinel has looked at everything from QAnon to MAGA, to COVID disinformation, to climate change disinformation.

d.   **Podcaster:** "What was interesting to me about that report is that it showed that there were a handful of accounts, that weren't just bots, but they were people who were highly coordinated and deeply networked and responsible for the vast majority of hate propaganda against the couple.

e.   **Christopher Bouzy (Owner of Bot Sentinel):**
  i.   We [Bot Sentinel] looked at 114,000 tweets, and we were able to determine that 70% of the hateful content came from just 83 accounts.

    ii.  And they had a reach of 17 million people.

    iii.  So this is not your everyday trolling… It's insane. And it was done by people who were just not the typical quote-unquote trolls. These are housewives. These are middle-aged Caucasian women creating just constant attacks, from "Go back to America," to basically, you know "Why don't you die?

    iv.  Samantha Markle was part of the group that was putting out a lot of this disinformation.

    v.  Samantha had her account suspended.

    vi.  And then we actually sent Twitter a list because she had, like, 11 additional accounts.

    vii.  And we were baffled by this.

    viii.  How can the half-sister of Meghan be part of a hate group?

f.  **Prince Harry:** Perhaps the most troubling part of this is the number of British journalists interacting with and amplifying the hate and the lies.

g.  **Christopher Bouzy:**

    i.  For the main hate accounts, their primary motive is monetizing this stuff.

    ii.  But the secondary accounts, it's all about hatred.

    iii.  It's about, you know… You know, race.

    iv.  So, then there would be derogatory terms where they would use the N-word on tweets. [Series. Season 1, Episode 5; 29:19 – 31:49].

h. **Prince Harry:** I think for people to really understand, you know when you plant a seed that is so hateful, what it can grow into. [Series. Season 1, Episode 5; 32:00]

i. **Meghan:** You're making people want to kill me – it's not just a tabloid. It's not just some story. You are making me scared. [Series. Season 1, Episode 5; 32:05].

This Segment has no breaks, no forays into other subjects, the quotes above fill the entire time from the 27-minute mark through the 32-minute mark. The subject matter of the segment is the dissemination of the disinformation surrounding Meghan and Prince Harry. Of the above 19 statements 15 are true, 2 are partially true, and 2 are false, and only one person is mentioned by name, Samantha.

### a. The Two False Statements

The two false statements, presented as fact, are: (1) "Samantha Markle was part of the group that was putting out a lot of this disinformation"; and (2) "And we were baffled by this. How can the half-sister of Meghan be part of a hate group." The Operative Complaint in paragraph 52 states: [t]he Series falsely accused SAMANTHA to be a member of a hate group which is about "race," and even used the "N-word." Meghan had a relationship with her sister, and knew, or could have found out, that this was a false statement, yet she published it anyway. Additionally, and contrary to the trial judge's assertion, the Operative Complaint specifically pointed out that this is a false statement.

17

Samantha has never been part of a hate group, nor has she ever disseminated disinformation about her half-sister Meghan and Prince Harry. The falsity of these two statements is verifiable, one simply needs to review the records of Twitter, from which professional investigator Christopher Bouzy created, and any other social media of Samantha to see that she has never disseminated information about Meghan and Prince Harry, nor has she ever been a member of a group that does. She is also not a racist. The two Statements are not opinion. They are stated as facts by Chris Bouzy who owns Bot Sentinel and who created the report about the hateful Twitter accounts.

The Operative Complaint alleged that Meghan was the producer and had creative control over the Netflix Documentary. She had a choice as to which interviews and which reports to include in the Series. She failed to do any research as to the veracity of the report by Bot Sentinel, or she knew the report had inaccuracies and published the report and Christopher Bouzy's statements, nonetheless.

### b. Statements where the Omission creates the Defamatory Implication.

The two Statements which are true but in which facts are omitted thereby creating the defamatory implication are: (1) "Samantha had her account suspended"; and (2) "And then we actually sent Twitter a list because she had, like, 11 additional accounts."

The trial judge held "her complaint logically precludes a defamation by implication claim as she fails to specify how Defendant has 'omitted' facts in a way that 'creates a defamatory implication.'" *Markle at* 54. The trial judge failed to see that these were discussed in Paragraphs 50 and 51 of the Operative Complaint, which were incorporated in each of the 2 counts.

> **Paragraph 50 of the Operative Complaint:**
> In truth, Samantha originally had only the one (1) original Twitter account and she was not part of the spreading of alleged misinformation. She was, however, the victim of hacking and individuals creating imposter accounts. As a result of the hacking and imposter accounts, she was forced to make her own other accounts when trolls of MEGHAN literally took over her one (1) original account.

> **Paragraph 51 of the Operative Complaint:**
> The suspension of her account, which is impliedly due to statements about MEGHAN, in reality, was a short "freeze" because of SAMANTHA's endorsement of Ivermectin. Others, unknown and unbeknownst to SAMANTHA had created other accounts in SAMANTHA's name. She was not suspended because of the alleged misinformation that was spread about MEGHAN and attributed to SAMANTHA's name and account.

The omission of these easily verifiable, and discoverable facts from the Segment, were used by Meghan to create the implication that Samantha's Twitter account was suspended for disinformation about Meghan and Prince Harry and that she was using her accounts to spread hate as to her half-sister Meghan and Prince Harry.

The other statement, which alleges that Samantha had 11 Twitter accounts that were disseminating disinformation, is also partially true. The Truth: Samantha had a Twitter account, however, she only had one account, and that account never disseminated disinformation about Meghan and Prince Harry. The Omitted Part: Samantha's Twitter account was hacked and false accounts were created in her name. Therefore, there were 11 accounts in Samantha's name. Some of which may have disseminated disinformation about Meghan and Prince Harry. However, as these were fake accounts, Samantha had no control over what the accounts were "tweeting". Samantha had only one account.

The failure to disclose the truth about the 11 accounts was intentional by Meghan and ties into Christopher Bouzy's statements from his report that of the 116,000 tweets reviewed, 83 accounts were responsible for disseminating 70% of the hate and disinformation about Meghan and Prince Harry; *and* therefore, of those 83 accounts Samantha had 11.

By omitting the fact that her Twitter account was hacked, the statement implies that Samantha through the 11 accounts was responsible for thousands of lies and hateful tweets about her half-sister and even though the accounts were in Samantha's name, they were not her accounts, they were not created by her. It can be shown that Meghan knew about the hacking, and if she did not, it was discoverable with minimal digging, and certainly Bot Sentinel in their professional

capacity would have been able to separate the fake accounts from the real accounts. Therefore, this truth of 11 accounts being fake accounts was omitted by Meghan, thereby creating a false narrative that Samantha's 11 accounts were part of the 83 accounts spewing disinformation.

Samantha was never part of the dissemination of disinformation as to Meghan and Prince Harry, and she never had 11 Twitter accounts which she created.

### c. The 15 True Statements

Fifteen of the Statements in the Segment were true and it is through their juxtaposition that Meghan implies that Samantha is part of the hate group spreading disinformation about Meghan and Prince Harry, that she is trying to capitalize on the hate and disinformation. The 15 statements surround the four statements that specifically mention Samanatha, when the Segment is viewed as a whole, Samantha is the only person mentioned by name in connection to the Twitter accounts and spreading of hate and disinformation.

The Operative Complaint addresses the true statements and their juxtaposition. In Paragraph 52, Samantha states "The implication of the statements said in the Series produced and edited by MEGHAN through her own words and hand-picked interviews were incredibly damaging and dangerous." (DE 72, ¶ 52).

Paragraph 77 of the Operative Complaint further show that Samantha plead these facts and sufficiently to put Meghan on notice as to which statements were true

21

and which statements were false and how the juxtaposition or omission created the implication of defamation.

> **Paragraph 77:**
> One can look at any one of the above statements from either of the Interview and the Series and see how those statements damage and defame SAMANTHA's character by the juxtaposition of MEGHAN's lies with facts to imply SAMANTHA is a liar, untruthful fame-seeker, racist and only out to hurt MEGHAN to make an unearned and unworthy name for herself.

It is true that Bot Sentinel reviewed and studied the accounts which were attacking Meghan. It is also true that a vast majority of the disinformation about Meghan and Prince Harry was coming from small groups of middle-aged white women. It is true that British journalists were amplifying many of the tweets about Meghan. It is also, unfortunately true, that some of the Twitter accounts were in fact spewing awful and horribly racist comments about Meghan.

Samantha is the only person named in the Segment. When the Segment is viewed as a whole, the Segment's run time is only 5 minutes and the 2 false statements and the 2 partially true statements are wedged in the middle of the 15 true statements. Reasonable people could (and have) watched this Segment and drawn the logical conclusion that the 15 true statements also apply to Samantha.

The First District Court of Appeal in *Thomas v. Jacksonville TV,* 699 So. 2d 800, 805 (Fla. 1st DCA 1997) cited to *AIDS Counseling & Testing Centers v. Group*

*W. Television, Inc.,* 903 F. 2d 1000 (4th Cir. 1990) as to the requirement for "of and

concerning and the Court in *AIDS Counseling & Testing,* held:

> Common sense, as well as the law of defamation, dictates
> that, in order for a claim for defamation to arise, a
> publication must refer to the individual who seeks to sue
> on the publication... <u>a publication must contain some
> special application of the defamatory matter to the
> individual... the circumstances [must] reasonably give rise
> to the conclusion that there is a particular reference to the
> individual</u>. *AIDS Counseling & Testing Centers v. Group
> W. Television, Inc.,* 903 F. 2d 1000 (4th Cir. 1990)
> (Questioned on other grounds) (Internal citations and
> quotations omitted) (Emphasis added).

The Segment references only one person by name who is part of the

dissemination of disinformation about Meghan and Prince Harry, Samantha. It is

highly plausible that a reasonable person, watching the Segment, could readily

conclude that the statements that imply Samantha is a horrible, racist person who

has numerous twitter accounts that spread disinformation about Meghan and Prince

Harry are "of and concerning" and attributed to Samantha.

When looking at Defamation by Implication, it is the juxtaposition of true

facts to create the implication of defamation. It is the juxtaposition of these 15

statements (coupled with the 2 false statements) that creates the defamatory

implication that Samantha is a racist, online troll, who spreads hate and

disinformation about Meghan and Prince Harry.

As shown, Samantha pled enough facts to state a Cause of action for Defamation by Implication and the District Court erred in its analysis of the Statements at issue.

**B. A reasonable person could attribute the statements as of or concerning, Samantha.**

When looking at the Statements from the Segment it is not a stretch to foresee a reasonable person attributing the statements to being "of or concerning" Samantha. The entire Segment is short, lasting only 5 minutes. Samantha is the only individual mentioned by name in the Segment, other than Meghan and Prince Harry. Christopher Bouzy is one of the foremost experts on hate groups operating on Twitter and despite its falsity, and specifically states:

    i.  We [Bot Sentinel] looked at 114,000 tweets, and we were able to determine that 70% of the hateful content came from just 83 accounts.

    ii.  And they had a reach of 17 million people.

    iii.  So this is not your everyday trolling… It's insane. And it was done by people who were just not the typical quote-unquote trolls. These are housewives. These are middle-aged Caucasian women creating just constant attacks, from "Go back to America," to basically, you know "Why don't you die?

    iv.  Samantha Markle was part of the group that was putting out a lot of this disinformation.

    v.  Samantha had her account suspended.

      vi. And then we actually sent Twitter a list because she had, like, 11 additional accounts.

     vii. And we were baffled by this.

   viii. How can the half-sister of Meghan be part of a hate group.
Series, Season 1, Episode 5, 28

A reasonable person watching this would see that Meghan, through publication of Christopher Bouzy, is speaking about Samantha as part of the groups disseminating disinformation and a member of the hate group towards Meghan and Prince Harry.

A reasonable person watching the Netflix Documentary, and upon hearing the above segment and statements, could only assume that the statements surrounding the statements about Samantha were about others, but also about Samantha. And therefore, the Segment, taken as a whole, was "of and concerning" Samantha. The juxtaposition of the true statements were of and concerning Samantha who is a racist online troll spreading disinformation and lies about her half-sister Meghan and trying to monetize the hate around Meghan.

The trial judge failed to look at the statements in context with the whole of the Segment. Prince Harry and Meghan's statements immediately follow those of Twitter-expert, Christopher Bouzy's. As the whole Segment is about disinformation, there are enough details to attribute those statements to Samantha. When looking at

Prince Harry's comments about amplification by the British media, and planting seeds of hate, those statements are made immediately following Christopher Bouzy's statement that Samantha was part of the group spreading hate.

The same went for Meghan's final statement that "You're making people want to kill me – it's not just a tabloid. It's not just some story. You are making me scared." The statement is vague but at the conclusion of a series of statements, four of which mention her half-sister, Samantha, and Samantha's role in disinformation and spreading of hate.

The trial judge, in reviewing the Netflix Documentary statements individually, concluded that a reasonable person would not be able to attribute the statements to Samantha. This was because the trial judge attempted to create a vacuum and review each statement individually. When taken as a whole it is very easy to see how a reasonable person, after hearing how Meghan has been harassed online by "trolls" who were not your "ordinary trolls but older Caucasian women" (which Samantha is), and that there are hate groups many of which are based on Meghan's race, and in the middle of the segment allowing for a reasonable person to apply the statements both before the mentioning of her name, and after, to attribute those statements to Samantha.

Finally, the fact that Samantha has suffered harassment specifically because of the Netflix Documentary is proof that a reasonable person could attribute all of the statements to Samantha. After all, they did.

## C. Actual Malice was plead

Archewell productions produced and distributed, through Netflix, the Netflix Documentary. Meghan and Prince Harry own Archewell Productions. Meghan is listed as a producer of the Netflix Documentary and she had creative control over the final product. In an interview with the Director of the Series Liz Garbus in The Hollywood Reporter, "Garbus noted they had creative input." Meghan hired Christopher Bouzy, who is an expert in cyber-bullying and online hate groups. Christopher Bouzy created a thorough report based on looking at thousands of Twitter accounts, and still Meghan published the facts from his report that stated Samantha had 11 accounts and was actively part of the hate groups targeting Meghan and Prince Harry.

> To plead actual malice, [a plaintiff] must allege facts sufficient to give rise to a reasonable inference that the false statement[s] [were] made 'with knowledge that [they were] false or with reckless disregard of whether [they were] false or not. The actual malice inquiry is subjective; it involves determining whether the defendant, "instead of acting in good faith, actually entertained serious doubts as to the veracity of the published account, or was highly aware that the account was probably false. *Corsi v. Newsmax Media, Inc.,* 519 F. Supp. 3d 1110, 1123 - 1124 (S.D. Fla. 2021) (internal quotations and citations omitted).

Christopher Bouzy is a professional. His profession is to review accounts and investigate sources of disinformation. In failing to disclose the real reason that Samantha's Twitter account was suspended, Meghan created the false narrative that Samantha's account was suspended for disinformation about Meghan, not Covid (which was the truth). Meghan omitted truthful facts to create the implication by defamation. Additionally, none of Samantha's Tweets were negative about Meghan, nor spread disinformation. She was not part of any hate group that was attacking Meghan online. Meghan hired Christopher Bouzy, or at the very least, approved of his segment in the Netflix Documentary. She reviewed and approved of the segment in which Samantha is mentioned. Meghan is the one who published the statements by Christopher Bouzy about her sister. She was aware that Samantha never wrote negative information about her. Therefore, she acted with malice when she published Bouzy's statements about Samantha.

**D. Publication**

Meghan established the prong of publication and the District Court acknowledged this in its opinion on Page 40, where the trial judge states: "Taking her allegations as true and drawing all reasonable inferences in her favor, the Plaintiff sufficiently pleads that Defendant "published" the statements. *Markle at 40.*

Samantha plead facts to state a cause of action for Defamation by Implication.

## **CONCLUSION**

The Appellant asks that this Court remand the underlying case to the District

Court with directions to reverse the decision.


Date: August 2, 2024                    Respectfully, submitted

                                        */s/ Peter David Ticktin*
                                        Peter David Ticktin, Esquire
                                        Jamie Sasson, Esquire
                                        Ryan Fojo, Esquire
                                        The Ticktin Law Group
                                        270 SW Natura Avenue
                                        Deerfield Beach, Florida 33441
                                        Telephone: (954) 570-6757

                                        *Attorneys for Appellant Samantha Markle*

**Certificate of Compliance With Type-Volume Limit,
Typeface Requirements, and Type-Style Requirements**

1.　This document complies with the word limit of Fed. R. App. P. 32(a)(7)(B) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f):

☒　this document contains 6,196 words, **or**

☐　this brief uses a monospaced typeface and contains [*state the number of*] lines of text

2.　This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because:

☒　this document has been prepared in a proportionally spaced typeface using Microsoft Word Version 2403 in 14 Point Times New Roman, **or**

☐　this document has been prepared in a monospaced typeface using [*state name and version of word-processing program*] with [*state number of characters per inch and name of type style*].

 /s/ Peter Tickin　　　　　

Attorney for the Appellant

Dated: July , 2024

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 2nd day of August 2024, a copy of the foregoing was filed with the Clerk of the Court using the Court's CM/ECF system, which will send a copy to all counsel of record.

*/s/ Peter Ticktin*
Peter Ticktin, Esquire
